# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| CAREY DEAN NOAH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:10CV 56 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Carey Dean Noah for Supplemental Security Income under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 16).

## Procedural History

On August 28, 2008, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on August 1, 2008. (Tr. 106-11). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated November 4, 2009. (Tr. 57, 61-65, 28-35). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied. (Tr. 6, 5). Thus, the decision of the

ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

**A.**    **ALJ Hearing**

Plaintiff's administrative hearing was held on October 8, 2009.  (Tr. 38).  Plaintiff was present and was represented by counsel.  (Id.).

The ALJ examined plaintiff, who testified that he was forty-four years of age and was married.  (Tr. 40).  Plaintiff stated that he did not live with his spouse and had not lived with her for about two years.  (Id.).  Plaintiff testified that he lived alone.  (Id.).

Plaintiff stated that he dropped out of school in the ninth grade because he lived on his own at the age of fifteen.  (Id.).  Plaintiff testified that he had not tried to obtain a GED because he has been working and trying to make a living.  (Id.).

Plaintiff stated that he last worked in 1995.  (Tr. 41).  Plaintiff testified that he worked as a delivery driver delivering pizza and food.  (Id.).  Plaintiff stated that he stopped working at this position because his mother became ill and he took care of her.  (Id.).  Plaintiff testified that he had a heart attack a few months after his mother died, in 1999.  (Id.).

Plaintiff stated that he had a defibrillator[1] implanted in 2001 and that the batteries in the defibrillator were replaced in 2004 and 2006.  (Id.).  Plaintiff testified that the defibrillator was replaced in 2007.  (Id.).  Plaintiff stated that, at the time of the hearing, the defibrillator was "trying to push its way out" of his chest.  (Id.).  Plaintiff testified that his doctors planned to try to

---

[1]An automated implantable cardioverter defibrillator ("AICD") is a device surgically implanted, usually in the chest, which continuously monitors a patient's cardiac activity and provides the appropriate electrical counter shock, on sensing ominous dysrhythmias.  See Stedman's Medical Dictionary, 500 (28th Ed. 2006).

fix it. (Id.). Plaintiff stated that he had been experiencing these problems with the defibrillator since it was implanted in 2007. (Id.). Plaintiff testified that he knows something is wrong with the defibrillator because he experiences pain and it is visibly poking out of his skin. (Tr. 42). Plaintiff stated that the defibrillator was too large when it was installed and it has been working its way out gradually over time. (Id.). Plaintiff testified that he began experiencing pain about six months prior to the hearing. (Id.). Plaintiff stated that the defibrillator was working properly as far as he knew. (Id.). Plaintiff testified that he also has a pace maker. (Id.).

Plaintiff stated that, at the time of the hearing, he was experiencing chest pains, his heart was "flipping," and he was a "nervous wreck." (Id.). Plaintiff testified that he also experienced blurred vision due to his heart problems. (Id.). Plaintiff stated that he experienced these symptoms about every day. (Id.). Plaintiff testified that the symptoms occur when he overdoes it, when he experiences stress, and sometimes simply when he goes to the bathroom. (Tr. 43). Plaintiff stated that it occasionally takes him three tries to take out the trash because he has to stop frequently. (Id.). Plaintiff testified that he experiences sharp pains in his chest, pressure, and shortness of breath. (Id.). Plaintiff stated that he experiences shortness of breath about every day. (Id.). Plaintiff testified that the shortness of breath lasts ten to twenty minutes and that he tries to lie down when it starts. (Id.).

Plaintiff stated that he last saw his doctor for his heart condition about six weeks prior to the hearing, although he was in the process of changing doctors. (Id.). Plaintiff testified that he had Medicaid benefits. (Id.).

Plaintiff stated that he experiences the sensation that his heart is flipping out four to six times a week when it is severe. (Tr. 43-44). Plaintiff testified that he has told his doctors about

this problem and that his doctors have not performed much testing recently. (Tr. 44). Plaintiff

stated that another stent was implanted in April or May of 2009, and that he may have undergone

an echocardiogram around that time. (Id.).

Plaintiff testified that he was taking medications, including Ranitidine,[2] Plavix,[3] Zetia,[4] and

Crestor.[5] (Tr. 44-45). Plaintiff stated that he was taking all of his medications as prescribed. (Tr.

45). Plaintiff testified that he experienced side effects from his medications. (Id.). Plaintiff stated

that his medications interfere with his thinking and cause dizziness. (Id.). Plaintiff testified that

the Nitroglycerin[6] causes terrible headaches and dizziness. (Id.). Plaintiff stated that he takes

Nitroglycerin about every day. (Id.). Plaintiff testified that he wears a Nitroglycerin patch and

that he experiences headaches as long as the patch is on. (Id.). Plaintiff stated that he puts a

patch on if he experiences chest pain. (Id.). Plaintiff testified that he has been wearing the

patches for about six years. (Tr. 46).

Plaintiff stated that he also experiences back issues. (Tr. 46). Plaintiff testified that he has

not received any treatment for his back problems. (Id.). Plaintiff stated that his back goes out

when he bends over and he is unable to stand back up. (Id.). Plaintiff testified that this typically

lasts for three or four days, but it occasionally lasts up to two weeks. (Id.). Plaintiff stated that

---

[2]Ranitidine is indicated for the treatment of gastric ulcer and GERD. See Physician's Desk Reference (PDR), 1672 (63rd Ed. 2009).

[3]Plavix is indicated for the treatment of patients with a history of recent MI. See PDR at 928.

[4]Zetia is indicated for the treatment of high cholesterol. See PDR at 2157.

[5]Crestor is indicated for the treatment of high cholesterol. See PDR at 678.

[6]Nitroglycerin is indicated for the prevention of angina pectoris due to coronary artery disease. See PDR at 2888.

he has never gone to the emergency room when his back went out.  (Id.).  Plaintiff testified that

he just recently obtained insurance.  (Id.).  Plaintiff stated that he has been experiencing back

problems for about fifteen years and that they have not worsened in this time.  (Id.).

Plaintiff testified that, in an average day, he tries to do chores and lies down often in

between.  (Id.).  Plaintiff stated that he is able to wash dishes for about five minutes before he has

to take a break.  (Tr. 47).  Plaintiff testified that it usually takes him two to three tries to take out

the trash.  (Id.).  Plaintiff stated that he occasionally has to ask his neighbor to let out his puppies.

(Id.).  Plaintiff testified that after washing dishes for five minutes, he runs out of breath, becomes

dizzy, and experiences blurred vision.  (Id.).

Plaintiff stated that he experiences blurred vision every day.  (Id.).  Plaintiff testified that

the blurred vision lasts between ten minutes to all day depending on his heart condition.  (Id.).

Plaintiff stated that he drives, although there are days that he does not drive.  (Id.).

Plaintiff testified that he does his own shopping.  (Id.).  Plaintiff stated that he does not do any

yard work.  (Id.).  Plaintiff testified that he occasionally does laundry.  (Id.).  Plaintiff stated that

he occasionally cooks.  (Id.).  Plaintiff testified that when he is unable to cook, he either does not

eat or someone cooks for him.  (Tr. 48).  Plaintiff stated that he has gone a day without eating

because he is unable to cook.  (Id.).  Plaintiff's attorney pointed out that plaintiff was "thin as a

rail."  (Id.).

Plaintiff testified that he smokes a half a package of cigarettes a day.  (Id.).  Plaintiff stated

that he experiences chest symptoms when he is not active.  (Id.).  Plaintiff testified that this occurs

several times a week.  (Id.).  Plaintiff stated that stress triggers his chest symptoms.  (Id.).

Plaintiff explained that financial issues and his inability to complete tasks cause him to experience

stress.  (Id.).

Plaintiff testified that he is able to walk one to one-and-a-half blocks on a good day.  (Id.).
Plaintiff stated that he is only able to stand for a few minutes.  (Tr. 49).  Plaintiff testified that,
when he experiences chest issues, he is unable to sit and needs to lie down.  (Id.).  Plaintiff stated
that he lies down every day for ten minutes to two hours.  (Id.).  Plaintiff testified that he takes
naps lasting one to two hours about four to five days in an average week.  (Id.).  Plaintiff stated
that he is unable to lift more than ten pounds due to the wires.  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he is able to stand about five
minutes.  (Id.).  Plaintiff stated that he would be able to sit comfortably for five to ten minutes at a
time, for a total of one to two hours in an eight-hour day.  (Tr. 50).  Plaintiff testified that he
would be able to stand for a total of a half-hour in an eight-hour day.  (Id.).  Plaintiff stated that
he would be able to walk fifteen to twenty minutes in an eight-hour day.  (Id.).  Plaintiff testified
that he would spend the remainder of the eight-hour day lying down trying to recover.  (Id.).

Plaintiff stated that he experiences nausea.  (Id.).  Plaintiff testified that he vomits two to
three times a day.  (Id.).  Plaintiff stated that he has been experiencing nausea since he had his
heart attack.  (Id.).  Plaintiff testified that he has been vomiting two to three times a day for about
two years.  (Tr. 51).  Plaintiff stated that he experiences nausea when his heart starts beating hard
and erratically.  (Id.).

Plaintiff testified that his hands swell when he tries to walk.  (Id.).  Plaintiff stated that his
hands usually stay swollen the whole day when this occurs.  (Id.).  Plaintiff testified that his hands
become stiff when they swell and he is unable to bend his fingers.  (Id.).  Plaintiff stated that he is
unable to pick up small items when his hands are swollen.  (Id.).  Plaintiff testified that he is

unable to open jars, twist a screwdriver, or hold his cane when his hands are swollen.  (Id.).

Plaintiff stated that he has been using a cane for about six years.  (Id.).  Plaintiff testified that his doctor suggested that he start using a cane when he began falling down and passing out about six years prior to the hearing.  (Tr. 52).

The ALJ re-examined plaintiff, who testified that he worked full-time as a self-employed delivery driver in 1995.  (Id.).  Plaintiff stated that he earned tips and that he did not remember how much he earned hourly.  (Id.).  Plaintiff testified that he was not sure whether he filed taxes in 1994 or 1995.  (Tr. 52-53).

The ALJ then examined vocational expert Ed Pagella, who testified that plaintiff's past work as a delivery driver was medium in exertion and unskilled.  (Tr. 53-54).  The ALJ asked Mr. Pagella to assume a hypothetical claimant with plaintiff's education and work history and the following limitations: capable of performing work at the sedentary exertional level; unable to climb ladders, ropes or scaffolds; can occasionally climb ramps and stairs; must avoid concentrated exposure to extreme cold and heat; and must avoid all exposure to heights and work hazards, including electromagnetic fields and microwaves.  (Tr. 54).  Mr. Pagella testified that the hypothetical individual would be unable to perform plaintiff's past work, but would be capable of performing work as a hand packer (113,200 positions in the national economy); hand assembler (106,000 positions in the national economy); and hand sorter (98,000 positions in the national economy).  (Id.).

The ALJ asked Mr. Pagella to assume that the hypothetical claimant experienced palpitations, which took him off task ten to twenty minutes every day outside of the normal break schedule.  (Id.).  Mr. Pagella testified that such an individual would be unable to perform

substantial gainful activity because employers would not tolerate an extra break every day. (Tr. 55).

Plaintiff's attorney then examined Mr. Pagella, who testified that a limitation of occasional reaching, handling, fingering, and feeling would eliminate the job base he identified. (Id.).

## B. **Relevant Medical Records**

Plaintiff suffered an anterior wall myocardial infarction[7] ("MI") on January 11, 1999. (Tr. 220). A cardiac catheterization[8] was performed, which revealed one hundred percent stenosis[9] of the left anterior descending (LAD) artery, which was successfully stented. (Id.). Plaintiff was discharged from University Hospital of Colorado in Denver on January 19, 1999. (Tr. 230). His discharge diagnoses were listed as anterior wall MI, pericarditis,[10] familial hypercholesterolemia,[11] left ventricular apical thrombus,[12] paroxysmal atrial fibrillation,[13] and decreased left ventricular function.

---

[7]Heart attack. Stedman's at 968.

[8]Insertion of a catheter into the heart to diagnose and treat heart conditions. See Stedman's at 327.

[9]Narrowing. Stedman's at 1832.

[10]Inflammation of the pericardium, which is the membrane covering the heart and beginning of the great vessels. See Stedman's at 1457.

[11]A disorder of high cholesterol that is inherited. The condition begins at birth and can cause heart attacks at an early age. See Stedman's at 922.

[12]A clot in the top of the left ventricle. See Stedman's at 1985.

[13]Condition in which the normal rhythmic contractions of the cardiac atria are replaced by rapid irregular twitchings of the muscular wall. Stedman's at 722-23.

(Id.).   His discharge medications included Digoxin,[14] Plavix, Metoprolol,[15] Atorvastatin,[16] Coumadin,[17] and Lisinopril.[18]  (Id.).

The record reveals an automated implantable cardioverter-defibrillator (AICD) was implanted in 2001 at University Hospital in Denver, Colorado.  (Tr. 313).  The battery was changed twice, in 2004 and 2006.  (Id.).

Plaintiff presented to University Hospital in Denver, Colorado for a routine, two-month evaluation on May 1, 2007.  (Tr. 235).  Plaintiff reported that he was feeling fairly well and that he was able to walk approximately three blocks without difficulty.  (Id.).  Plaintiff indicated that he had episodes of palpitations,[19] occurring one to two times per week associated with nausea and fatigue. (Id.).  Plaintiff was diagnosed with ischemic cardiomyopathy[20] and heart failure[21] with New York

---

[14]Digoxin is indicated for the treatment of mild to moderate heart failure and for the treatment of patients with chronic atrial fibrillation.  See PDR at 1499.

[15]Metoprolol is indicated for the treatment of hypertension, angina pectoris, and heart failure.  See PDR at 668.

[16]Atorvastatin is indicated for the prevention of cardiovascular disease.  See PDR at 2503.

[17]Coumadin is indicated for the treatment of blood clots.  See WebMD, http://www.webmd.com/drugs (last visited September 15, 2011).

[18]Lisinopril is indicated for the treatment of hypertension.  See PDR at 2088.

[19]Forcible or irregular pulsation of the heart, perceptible to the patients, usually with an increase in frequency or force, with or without irregularity in rhythm.  Stedman's at 1408.

[20]Disease of the heart muscle.  Stedman's at 313.

[21]Inadequacy of the heart so that as a pump it fails to maintain the circulation of blood, with the result that congestion and edema develop in the tissues.  Resulting clinical syndromes include shortness of breath, edema, enlarged tender liver, engorged neck veins, and pulmonary rales.  Stedman's at 699.

Heart Association Class III symptoms;[22] coronary artery disease;[23] familial hypercholesterolemia; paroxysmal atrial fibrillation; tobacco abuse; and depression, which was controlled off of therapy. (Tr. 236-37).

Plaintiff underwent an echocardiogram at University Hospital in Denver on September 7, 2007, which revealed an ejection fraction[24] of 30 to 35 percent. (Tr. 234).

Plaintiff presented to Hannibal Regional Hospital in October 2008 with complaints that his AICD was beeping. (Tr. 313). Plaintiff complained of decreased exercise tolerance and shortness of breath, chest pain after climbing a flight of stairs, difficulty breathing on exertion, and irregular heart beat. (Id.). The assessment of the examining physician was remove and replace AICD. (Tr. 314).

Plaintiff underwent a chest x-ray on October 6, 2008, which revealed no acute process of the chest. (Tr. 319).

On October 7, 2008, plaintiff's AICD was replaced with a new AICD due to its coming to the end of its battery life. (Tr. 317).

Ruth Stoecker, M.D. completed a Physical Residual Functional Capacity Assessment on

---

[22]Patients with Class III symptoms have a marked limitation on physical activity. They are comfortable at rest, but less-than-ordinary physical activity causes fatigue, heart palpitations, trouble breathing, or chest pain. See WebMD, http://www.webmd.com/a-to-z-guides/classification-of-heart-failure-topic-overview (last visited September 15, 2011).

[23]Narrowing of the coronary arteries. See Stedman's at 554.

[24]The ejection fraction is a measurement of the heart's efficiency and can be used to estimate the function of the left ventricle. The ejection fraction is the amount of blood pumped divided by the amount of blood the ventricle contains. A normal ejection fraction is more than 55 percent of the blood volume. See WebMD, http://www.webmd.com/hw-popup/ejection-fraction (last visited September 15, 2011).

February 27, 2009. (Tr. 323-28). Dr. Stoecker expressed the opinion that plaintiff was capable of occasionally and frequently lifting ten pounds, standing or walking at least two hours in an eight-hour day, sitting a total of about six hours in an eight-hour day, and pushing or pulling an unlimited amount. (Tr. 324). Dr. Stoecker found that plaintiff could never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 326). Dr. Stoecker indicated that plaintiff had no manipulative, visual, or communicative limitations. (Id.). Dr. Stoecker found that plaintiff should avoid all exposure to hazards, including machinery and heights; and should avoid concentrated exposure to extreme cold and heat. (Tr. 327).

Plaintiff presented to Hannibal Regional Hospital on March 19, 2009, with complaints of chest pain and shortness of breath. (Tr. 366). Plaintiff also reported malaise, a cough, and tingling in his hands and feet. (Tr. 367). Plaintiff indicated that the shortness of breath occurs after he exerts himself. (Id.). Plaintiff stated that he may have "over done it" after spending the day running errands and keeping appointments in St. Louis. (Tr. 368). Plaintiff underwent chest x-rays, which revealed old granulomatous disease,[25] AICD in place, and no evidence of heart failure or pneumonia. (Tr. 375). Plaintiff was diagnosed with shortness of breath and numbness/tingling, and was discharged to home. (Tr. 376).

Plaintiff presented to the Hannibal Regional Medical Group Cardiovascular Institute for a follow-up exam on March 26, 2009, at which time he reported that his condition was "no better, no worse." (Tr. 339). Plaintiff complained of chest pain, difficulty breathing on exertion, and irregular heart beat and palpitations. (Tr. 340).

---

[25]A congenital defect in the killing of bacteria which results in increased susceptibility to severe infection by microorganisms. See Stedman's at 553.

Plaintiff presented to Hannibal Regional Hospital on April 2, 2009, with complaints of an increase in episodes of exertional shortness of breath and chest pain. (Tr. 335). Plaintiff reported smoking a package of cigarettes a day. (Tr. 336). Plaintiff was admitted for diagnostic cardiac catheterization. (Id.). Plaintiff underwent cardiac catheterization on that date, which revealed 80 to 90 percent in-stent restenosis[26] in the left anterior descending artery and a left ventricular ejection fraction of 35 percent. (Tr. 333). Plaintiff also underwent angioplasty[27] with the insertion of a stent. (Tr. 433). Pervez Alvi, M.D. discharged plaintiff to home on April 3, 2009, and strongly advised him to stop smoking. (Tr. 333). Plaintiff's discharge diagnoses were: exertional angina,[28] coronary artery disease, ischemic cardiomyopathy, left ventricular apical aneurysm,[29] and chronic tobacco abuse. (Id.).

Plaintiff presented to Dr. Alvi for a follow-up on April 17, 2009, at which time plaintiff reported that he was feeling better. (Tr. 400). Plaintiff was still smoking one half package of cigarettes a day despite recommendations to stop smoking. (Id.). Plaintiff continued to report chest pain, difficulty breathing on exertion, and irregular heart beat and palpitations. (Tr. 401). Dr. Alvi continued plaintiff's medications and advised him to stop smoking. (Tr. 402).

Plaintiff presented to the emergency department at Hannibal Regional Hospital on May 1,

---

[26]Recurrence of stenosis after corrective surgery on the heart valve. See Stedman's at 1678.

[27]An operation for enlarging the narrowed lumen of a coronary artery. See Stedman's at 88.

[28]A severe, often constricting pain or sensation of pressure. Stedman's at 85.

[29]Thinning, stretching, and bulging of a weakened ventricular wall, usually as a result of MI. Stedman's at 84.

2009, with complaints of epistaxis.[30] (Tr. 490). Plaintiff was transferred to University of Missouri on May 4, 2009, for further evaluation and treatment. (Tr. 492, 442). Plaintiff reported that the bleeding was mostly from the left side of his nose. (Tr. 442). He denied any chest pain, shortness of breath, nausea, vomiting, or lightheadedness. (Id.). The examining physician noted that the bleeding was not very brisk at his initial examination and had resolved by the time the evaluation ended. (Tr. 444). Plaintiff was admitted overnight for observation and did not have any re-bleeding. (Tr. 446). Plaintiff was discharged on May 5, 2009, and was instructed to restart aspirin and Plavix, and stop Coumadin. (Id.).

Plaintiff presented to Dr. Alvi for a follow-up on July 14, 2009. (Tr. 468). Plaintiff reported feeling fine, although he occasionally experienced palpitations and sharp left chest pains. (Id.). Plaintiff was smoking two to three cigarettes a day. (Id.). Plaintiff underwent an EKG, which revealed a normal sinus rhythm and an old anterlateral MI. (Tr. 470). Plaintiff's AICD was checked. (Id.). Dr. Alvi noted that clinically, plaintiff was doing well. (Id.). He continued plaintiff's medications and recommended that plaintiff follow-up in three months. (Id.).

### The ALJ's Determination

The ALJ made the following findings:

1.      The claimant has not engaged in substantial gainful activity since August 26, 2008, the application date (20 CFR 416.971 *et seq.*).

2.      The claimant has the following severe impairments: cardiomyopathy and ischemic heart disease (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

---

[30]Bleeding from the nose. Stedman's at 658.

4.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a) except that the claimant can only occasionally climb ramps and stairs, may never climb ladders, ropes, or scaffolds, must avoid concentrated exposure to extreme cold and heat, and must avoid all heights and work hazards, which include electromagnetic fields and microwaves.

5.     The claimant has no past relevant work (20 CFR 416.965).

6.     The claimant was born on January 25, 1965 and was 43 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963).

7.     The claimant has a marginal education and is able to communicate in English (20 CFR 416.964).

8.     Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.    The claimant has not been under a disability, as defined in the Social Security Act, since August 26, 2008, the date the application was filed (20 CFR 416.920(g)).

(Tr. 30-34).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on August 26, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 35).


## Discussion

### A.     Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to

the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel,

222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough

that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v.

Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two

inconsistent positions from the evidence and one of those positions represents the Commissioner's

findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th

Cir. 1992).   The reviewing court, however, must consider both evidence that supports and

evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015,

1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court

must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The

analysis required has been described as a "searching inquiry."  Id.

## B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which can

be expected to result in death or has lasted or can be expected to last for a continuous period of

not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant

has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a

person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-

42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); <u>Fines v. Apfel</u>, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. <u>See</u> 20 C.F.R §§ 404.1520 (c)), 416.920 (c)). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." <u>Id.</u> Age, education and work experience of a claimant are not considered in making the "severity" determination. <u>See id.</u>

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. <u>See id.</u> If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if

s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity.  Plaintiff next argues that the ALJ erred in assessing the credibility of plaintiff's subjective complaints.  Plaintiff also argues that the ALJ failed to discuss the opinions of plaintiff's friends.  Plaintiff finally argues that the hypothetical question posed to the vocational expert was erroneous and that the ALJ failed to properly consider the vocational expert's testimony.  The undersigned will discuss plaintiff's claims in turn, beginning with the ALJ's credibility analysis.

## 1.    Credibility Analysis

Plaintiff argues that the ALJ erroneously found his subjective complaints of pain and limitation not credible.  Specifically, plaintiff contends that the ALJ did not perform a credibility analysis and did not explain why she found plaintiff's complaints not credible.  Defendant contends that the ALJ properly applied the Polaski factors and found that plaintiff's subjective complaints were not credible.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (quoting settlement

agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

In this case, the ALJ concluded that plaintiff's testimony at the hearing was "somewhat credible," but stated that, to the extent plaintiff's testimony regarding the effects of his physical impairment on his basic work activities conflicted with the evidence of record, she was rejecting those inconsistent statements. (Tr. 33). Specifically, the ALJ stated that she was giving "little weight" to plaintiffs' testimony regarding his "extreme limitations" in sitting, standing, and walking, as they were unsupported by any medical opinion evidence or treatment notes. (Id.).

The undersigned finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is not supported by substantial evidence in the record as a whole. The ALJ did not cite the Polaski factors in her decision and did not undertake an analysis of the relevant factors. Although the ALJ discussed plaintiff's testimony regarding his limitations and the side effects of his medications, the ALJ did not explain how this testimony was inconsistent with the record. The ALJ did not indicate that plaintiff's testimony regarding his

daily activities was inconsistent with his subjective complaints of limitations.

The ALJ appeared to base her credibility determination on the objective medical record. While this is a factor upon which the ALJ may rely, it may not be solely relied upon by an ALJ to discredit a plaintiff's subjective complaints. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ summarized the medical evidence of record but did not explain how this evidence was inconsistent with plaintiff's testimony. In fact, the evidence discussed by the ALJ tended to support plaintiff's subjective complaints. The evidence revealed plaintiff consistently complained of shortness of breath, chest pain, and palpitations. After summarizing this evidence, the ALJ indicated that she was assigning "great weight" to the physical residual functional capacity assessment of state agency medical consultant Dr. Ruth Stoecker. (Tr. 33). As such, the ALJ appeared to discredit plaintiff's subjective complaints based solely on the findings of a state agency physician who did not examine plaintiff.

Plaintiff also argues that the ALJ erred in failing to mention the opinions of plaintiff's friends, Sonny Memanigal and Carolyn Boston. The ALJ must give full consideration to evidence presented relating to observations by third parties. Polaski, 739 F.3d at 1322. Although specific articulation of credibility determinations is preferable, lack thereof does not require reversal when the ultimate finding is supported by substantial evidence on the record. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000). When the same evidence supports discounting a third party's testimony, an ALJ's failure to give specific reasons for disregarding such testimony is inconsequential. Id.

Mr. Memanigal and Ms. Boston each completed and submitted questionnaires regarding plaintiff. (Tr. 178-81; 19-22). The ALJ did not discuss either. Both statements corroborated

plaintiff's allegations of lack of energy and strength, inability to do chores, and use of a cane. (Id.). There is no indication as to whether or not the ALJ considered the statements of Mr. Memanigal and Ms. Boston. Without even mentioning the statements, it is impossible to tell whether the ALJ gave these third-party observations the full consideration they deserved. See Polaski, 739 F.3d at 1322.

In conclusion, the ALJ failed to give good reasons for discrediting plaintiff's complaints. As such, the ALJ's credibility analysis is lacking. The ALJ also failed to properly consider the third party statements of Sonny Memanigal and Carolyn Boston. Accordingly, the undersigned will order that the decision of the Commissioner be reversed and this cause be remanded for a more thorough and accurate evaluation of plaintiff's subjective complaints of pain and limitations. Upon remand, the ALJ should also consider the third party statements of Mr. Memanigal and Ms. Boston, and any other such information submitted upon rehearing.

**2.      Residual Functional Capacity**

Plaintiff argues that the ALJ erred in determining his residual functional capacity. Specifically, plaintiff contends that the ALJ relied on the opinion of a state agency physician and omitted medical evidence that supported a more restrictive residual functional capacity.

The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary wok as defined in 20 CFR 416.967(a) except that the claimant can only occasionally climb ramps and stairs, may never climb ladders, ropes, or scaffolds, must avoid concentrated exposure to extreme cold and heat, and must avoid all heights and work hazards, which include electromagnetic fields and microwaves.

(Tr. 30-31).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer, 245 F.3d at 704.

In the instant case, the undersigned finds that the ALJ's assessment of residual functional capacity is not supported by substantial evidence. In her opinion, the ALJ acknowledged that the only evidence in the record regarding plaintiff's functional limitations consisted of the opinion of the non-examining state agency physician. (Tr. 33). The opinion of a consulting physician who does not examine the claimant does not generally constitute substantial evidence. See Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Kelley, 133 F.3d at 589.

Dr. Ruth Stoecker completed a Physical Residual Functional Capacity Assessment on February 27, 2009. (Tr. 323-28). Dr. Stoecker expressed the opinion that plaintiff was capable of occasionally and frequently lifting ten pounds, standing or walking at least two hours in an eight-hour day, sitting a total of about six hours in an eight-hour day, and pushing or pulling an unlimited amount. (Tr. 324). Dr. Stoecker found that plaintiff could never climb ladders, ropes,

or scaffolds; occasionally climb ramps or stairs; and frequently balance, stoop, kneel, crouch, and crawl. (Tr. 326). Dr. Stoecker indicated that plaintiff had no manipulative, visual, or communicative limitations. (Id.). Dr. Stoecker found that plaintiff should avoid all exposure to hazards, including machinery and heights; and should avoid concentrated exposure to extreme cold and heat. (Tr. 327).

The ALJ stated that she was assigning "great weight" to Dr. Stoecker's opinion because Dr. Stoecker examined plaintiff's records thoroughly, is a disability expert familiar with the SSA's policies, and her conclusions are "generally consistent with" the medical evidence of record. (Tr. 33). Significantly, although the ALJ claims that Dr. Stoecker's opinion is consistent with the objective medical evidence, none of plaintiff's treating physicians have expressed an opinion regarding plaintiff's functional limitations.

The record reveals that plaintiff was diagnosed with ischemic cardiomyopathy and heart failure with New York Heart Association Class III symptoms, and coronary artery disease on May 1, 2007. (Tr. 236-37). Plaintiff complained of palpitations associated with nausea and fatigue. (Tr. 235). Plaintiff had an ejection fraction of 30 to 35 percent on September 7, 2007. (Tr. 234). In October 2008, plaintiff complained of decreased exercise tolerance, shortness of breath, chest pain, difficulty breathing on exertion, and irregular heart beat. (Tr. 313). On March 19, 2009, plaintiff presented to Hannibal Regional Hospital with complaints of chest pain, shortness of breath, malaise, and tingling in his hands and feet. (Tr. 366-67). Plaintiff complained of chest pain, difficulty breathing on exertion, and irregular heart beat and palpitations at a March 26, 2009 follow-up exam. (Tr. 340). On April 2, 2009, plaintiff reported an increase in episodes of exertional shortness of breath and chest pain. (Tr. 335). Plaintiff underwent cardiac

catheterization, which revealed 80 to 90 percent in-stent restenosis in the LAD and a left ventricular ejection fraction of 35 percent. (Tr. 333). Plaintiff continued to complain of chest pain, difficulty breathing on exertion, and irregular heart beat and palpitations on April 17, 2009. (Tr. 401). Plaintiff was treated for a severe episode of epistaxis from May 1, 2009, through May 5, 2009. (Tr. 490, 446). At a follow-up with Dr. Alvi on July 14, 2009, plaintiff continued to complain of palpitations and chest pains. (Tr. 468).

The medical record reveals that plaintiff has sought regular treatment for his heart impairments since his alleged onset date. Plaintiff has consistently complained of chest pain, difficulty breathing on exertion and irregular heart beat with palpitations. Dr. Stoecker rendered her opinion in February 2009 based upon a review of the record. As such, Dr. Stoecker did not have the benefit of a significant amount of medical evidence dated after that time. This evidence reveals that plaintiff continued to complain of significant symptoms due to his heart impairments.

Plaintiff takes numerous prescription medications to control these symptoms. Plaintiff testified that these medications cause side effects, including mental difficulties, dizziness, and headaches. (Tr. 44-45). Plaintiff testified that he must lie down when he experiences chest symptoms and is unable to sit. (Tr. 49). Plaintiff's serious heart impairments could reasonably be expected to produce the symptoms and limitations plaintiff described and the undersigned has found that the ALJ erred in discrediting plaintiff's subjective complaints. Dr. Stoecker's opinion did not take into consideration plaintiff's testimony regarding his limitations. Thus, Dr. Stoecker's opinion does not constitute substantial evidence in support of the ALJ's residual functional capacity determination.

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to

function in the workplace.  See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).  In this case, the ALJ's residual functional capacity fails Lauer's test that the residual functional capacity be supported by *some* medical evidence.  See Lauer, 245 F.3d at 703.  As such, the ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiffs ability to function in the workplace.  Without such medical evidence addressing plaintiff's ability to function in the workplace, the ALJ cannot make an informed decision about plaintiff's functional restrictions.  As explained above, due to this omission, the ALJ has assessed a residual functional capacity which is not based on substantial medical evidence in the record.

After determining plaintiff's residual functional capacity, the ALJ then found that plaintiff could perform other jobs that exist in significant numbers in the national economy.  (Tr. 34).  The undersigned has found that the residual functional capacity formulated by the ALJ was not supported by substantial evidence.  The hypothetical question posed to the vocational expert was based on this erroneous residual functional capacity.  As such, the ALJ's step five determination was similarly  not supported by substantial evidence

### Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence.  The ALJ failed to properly assess the credibility of plaintiff's subjective complaints of pain and limitations.  The ALJ failed to develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace.  The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity.  The ALJ then

posed a hypothetical question to the vocational expert based on this erroneous residual functional capacity. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this  23rd  day of September, 2011.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE